HELEN T. PELOUZE *et al.* Exrs., Appellants, *vs.* HARRISON B. SLAUGHTER, Exr. *et al.* Appellees.

*Opinion filed June 16, 1909—Rehearing denied October 6, 1909.*

1. APPEALS AND ERRORS—*error cannot be assigned on opinion of Appellate Court.* Error cannot be assigned on the opinion of the Appellate Court, and if the judgment of the Appellate Court is correct it will not be reversed even though the Supreme Court does not agree with the reasons given for the correct decision.

2. SAME—*duty of a party obtaining affirmative relief.* A party obtaining affirmative relief by a decree must preserve the evidence upon which it is founded, either by a certificate of evidence or by a recital of facts in the decree.

3. SAME—*a party obtaining decree has no right to appeal from its findings.* A party who obtains a decree in full accordance with his claims has no right to appeal from findings of the court embodied in the decree.

4. SAME—*purpose of statutory assignment of cross-errors.* The purpose of the statutory assignment of cross-errors is to enable the court of review to finally decide the controversy without necessitating a separate appeal or writ of error.

5. SAME—*rule as to necessity for assigning cross-errors.* Except as a matter of practice, where an appellee or defendant in error desires alleged errors against him to be corrected upon a second trial in case the judgment is reversed, an assignment of cross-errors is only required where appellee or defendant in error seeks a reversal of the decree or judgment in some particular and might have appealed or sued out a writ of error to obtain such reversal.

6. SAME—*appellee may sustain decree on any facts in the record without assigning cross-error.* An appellee or defendant in error has a right, without assigning cross-errors on the findings

of the decree, to sustain the decree upon any facts in the record, whether they are the same as those found by the decree or not, and may in like manner sustain the judgment of the Appellate Court whether the reasons given in the opinion are good or not.

7. GAMBLING CONTRACTS—*the party asserting that transactions were gambling ones has the burden of proof.* Executors who file a bill in equity, under section 132 of the Criminal Code, against stock brokers have the burden of proving the allegations of their bill that the sales and purchases of stocks made by the defendants for their testatrix were gambling transactions.

8. SAME—*when broker is a "winner," under section 132 of the Criminal Code.* Under section 132 of the Criminal Code a broker is liable as a "winner" for losses of his customer if there was an understanding between them that there was to be a settlement between them on differences, only, and that there was to be no right on the part of the customer to demand and receive the stocks or any obligation to take or pay for them; but it must appear that both parties had the intention of settling on differences, only.

9. SAME—*what does not justify the inference that stock transactions were gambling ones.* The fact that the purchases and sales of stocks made by brokers for a customer were of great magnitude in proportion to the wealth of the customer does not justify an inference of an intention to settle on differences, only, where there is no proof of such intention and where the stocks were actually sold and delivered or received and paid for by the brokers, and there was no time when the customer could not have paid the balance due if the value of the stocks were taken into account.

10. SAME—*sales and purchases by broker under general order are not necessarily gambling transactions.* The fact that sales and purchases of stocks are made by a broker under a general order to use his own discretion in buying and selling, without a specific order from his customer, does not make the transactions gambling ones, where each purchase or sale was reported to the customer and ratified by her on the day it was made, and where there is no proof of any intention to settle on differences, only.

11. SAME—*when section 132 of Criminal Code does not apply.* Where, at the time of the death of a person who has been buying and selling stocks through a broker, the account stands with a profit in favor of the customer, losses subsequently occurring to the estate through the depreciation in value of stocks during the time they were under the control of the executors cannot be recovered by the executors from the broker under section 132 of the Criminal Code, upon the theory that the original purchases of the stocks were gambling transactions.

HAND, J., dissenting.

APPEAL from the Branch Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. J. W. MACK, Judge, presiding.

WILLIAM E. O'NEILL, and MORRIS ST. P. THOMAS, for appellants:

Gambling in stocks is illegal, and the loser is entitled to recover his losses from the winner by action at law or bill in equity. Whether the transactions are wagers is to be determined from a consideration of all the facts and circumstances. Crim. Code, sec. 132; *Jamieson* v. *Wallace,* 167 Ill. 388; *Pardridge* v. *Cutler,* 168 id. 504; *Pearce* v. *Foote,* 113 id. 228; *Cothran* v. *Ellis,* 125 id. 496; *Booth* v. *People,* 186 id. 43; *Commission Co.* v. *People,* 209 id. 528; *Bartlett* v. *Slusher,* 215 id. 348; *Carroll* v. *Holmes,* 24 id. 453; *Miles* v. *Andrews,* 40 id. 155; *Irwin* v. *Williar,* 110 U. S. 499; *Sharp* v. *Stalker,* 63 N. J. Eq. 596; *Cashman* v. *Root,* 12 L. R. A. 511; *Flagg* v. *Baldwin,* 38 N. J. Eq. 219; *Stewart* v. *Schall,* 65 Md. 289; *Gregory* v. *Wendell,* 39 Mich. 337; *North* v. *Phillips,* 89 Pa. St. 250; *Ruchizky* v. *DeHaven,* 97 id. 202.

The object sought to be accomplished by section 132 of the Criminal Code cannot be defeated by resort to the equitable doctrines relating to *laches,* acquiescence, ratification or estoppel, or by any supposed application of the maxim that he who seeks equity must do equity. If the transactions in question were gambling transactions they were void by the express language of the statute, and could not be rendered valid by acts or conduct of the parties. 2 Pomeroy's Eq. Jur. sec. 964, and note; 1 Story's Eq. Jur. secs. 306, 345; 2 Beach on Contracts, secs. 1499, 1453.

In the absence of the statute, equity would not have entertained this bill. 2 Pomeroy's Eq. sec. 938; *Petillon* v. *Hipple,* 90 Ill. 420; *Inhabitants* v. *Eaton,* 11 Mass. 369; *Lord St. John* v. *Lady St. John,* 11 Ves. Jr. 526; *Hershey*

v. *Weitung,* 50 Pa. St. 240; *Goble* v. *O'Connor,* 43 Neb. 49; *McCredie* v. *Buxton,* 31 Mich. 383; *Bleakley's Appeal,* 66 Pa. St. 187; *Lyons* v. *Cole,* 117 Mass. 382.

At the time the bill was filed the transactions in question were executed gambling contracts. *Jamieson* v. *Wallace,* 167 Ill. 388.

The statute under which the bill was brought is penal, and not remedial. *Kizer* v. *Walden,* 198 Ill. 274; *Robson* v. *Doyle,* 191 id. 566; *Hearst case,* 95 Fed. Rep. 656.

JACOB NEWMAN, HIRAM T. GILBERT, and JOHN J. HERRICK, for appellees:

A stock broker who also lends money to his customers and holds as security the stocks purchased, is, in fact, a banker who, in addition to his business of banking, attends to the purchase and sale of stocks for his customers. He is entitled to same protection from the courts as any banker or lender of money. *Peter* v. *Grimm,* 149 Pa. St. 163.

Even if a purchase of stocks might otherwise be regarded as a gambling transaction, it becomes legitimate and enforcible if, after the purchase is made, the person for whom it is made agrees to accept delivery. *Anthony* v. *Unangst,* 174 Pa. St. 10.

That principle is decisive of the case at bar. After Mrs. Thompson's death there were no new purchases of stocks by the complainants, but they demanded and received delivery of a portion of the stocks on hand, assumed control over the remaining stocks, and conclusively evidenced a claim, on their part, of a right to demand delivery and exercise dominion over all of the stocks.

The maxim "He who seeks equity must do equity" prohibits the complainants, in any event, from recovering the city railway and the Atchison preferred stock without first paying, or offering to pay, back the money received by Mrs. Thompson, with interest. *Mumford* v. *Trust Co.* 4 N. Y.

463; *Chapin* v. *Dake,* 57 Ill. 295; *Thompson* v. *Williamson,* 58 Atl. Rep. 602.

The court in this case is proceeding in the exercise of its ordinary equity jurisdiction, and not by virtue of a special power conferred upon it by statute. *Petillon* v. *Hipple,* 90 Ill. 420.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

Medora Gale Thompson died on February 14, 1902, and seventeen months afterward the appellants, as executors of her last will and testament, filed the bill in this case in the circuit court of Cook county against appellees to recover the possession of certain stocks held by appellees, or the value of the same, on the ground that such stocks were received by virtue of gambling transactions carried on between said Medora Gale Thompson and the appellees from January, 1896, to the time of her death. The appellees filed an answer denying that the transactions between them and Medora Gale Thompson were gambling transactions, and alleging that at the time of her death she was indebted to them in a large sum of money, for which they held as security shares of stock purchased by them for her which could readily have been sold at that date for $169,000, and also 225 shares of Chicago City railway stock deposited with them by her; that at the time of her death the appellants had full knowledge of the transactions and the nature of the same, and that the appellants, as executors, at different times ordered the sale and delivery of the stock so purchased and held by appellees. After the filing of the bill the appellees sold at public sale, on notice to the appellants, the stocks then in their hands, except 49 shares of Chicago City railway stock, and applied the proceeds on the indebtedness to them, which reduced it to $13,714.34, and they afterward filed a cross-bill to enforce a lien against said remaining stocks for the indebtedness. The cross-bill

was answered, with a denial that the appellants were indebted in the sum of $13,714.34, as charged in the cross-bill, or that the appellees had any right to the 49 shares of the Chicago City railway stock as security for the same.

The facts were not in dispute, and are, in substance, as follows: The appellees, as members of the firm of A. O. Slaughter & Co., or its successor, A. O. Slaughter, Jr. & Co., were engaged in business in Chicago in the purchase and sale of stocks, bonds and other securities on commission, and loaning money. In 1896 Mrs. Thompson, who was a widow of mature age, personally managing her own business and worth somewhere about $250,000, commenced to give orders to the appellees to buy such stocks for her as she from time to time desired to purchase. An arrangement was made by which they let her have money for the purpose of making the purchases, and she deposited with them, from time to time, securities to protect them against loss in the purchases and sales, and they let her have money, for which she agreed to pay interest at rates agreed upon from time to time. She ordered purchases of certain stocks, and her orders were carried out and reports made to her the same day. When she chose to sell she gave an order for a sale, and it was made and reported to her in like manner. About September 30, 1898, she authorized certain members of the firm to buy and sell stocks for her as before, but without specific orders and on their own judgment. The business was carried on up to her death in the same manner as before, except that the purchases and sales were made under that arrangement, and each purchase and sale was reported to her the same day that it was made and was ratified and confirmed by her. The stocks were bought in Chicago and New York, but almost wholly in New York, and in every instance they were actually bought and paid for and delivered. The appellees had correspondents in New York who were members of the stock exchange and would wire a correspondent to buy certain stocks. The

correspondent thereupon bought the stocks for cash, and the certificates were delivered to the purchaser the next day by 2:15 P. M. and the purchase price was paid. The price was charged to the appellees on the books of the New York firm, and when sales were made the selling price was received and credited to the appellees. If a sale of stocks not on hand was made, the stocks were borrowed to make delivery to the buyer and a check was given to the lender for the market value, and when such stocks were bought the certificates were received and paid for and delivered to the person from whom the stocks were borrowed. Every transaction was actual, *bona fide* and for cash, and the certificates were received and held by the New York correspondents for the appellees, ready to be delivered upon payment. The appellees, upon receipt of each statement from the New York correspondent, charged Mrs. Thompson with the amount of the purchase or credited her with the amount of the sale, and their only interest was the commissions for attending to the business and interest on money advanced to her. In addition to the report of each purchase and sale, the appellees, at the end of each month, sent Mrs. Thompson a statement of her account showing the stocks on hand, their market value, the condition of the account and the balance due them. She acknowledged the receipt of each statement down to November 30, 1901, which was acknowledged by her daughter, Helen T. Pelouze, one of the appellants, for her. Each letter acknowledging the receipt of a statement stated that the account had been examined and found correct, and each statement contained this: "All orders for the purchase and sale of any article are received and executed with the distinct understanding that actual delivery is contemplated and that the party giving the order so understands and agrees." At the death of Mrs. Thompson the balance of the account against her was $199,411.48, and appellees had on hand stocks of the value of $173,000, and also 225 shares of Chicago City railway

stock which had been deposited with them by Mrs. Thompson. On the whole series of transactions there was a profit to her. After her death, at various times, the appellants directed the appellees to sell certain of the shares and to deliver other shares to certain brokers in New York and receive payment for the same. The appellants in that way disposed of all the stocks on hand at the death of Mrs. Thompson except 2100 shares of Union Bag and Paper, which was of the value of $36,000 at her death. Appellants also deposited with the appellees, as security, certain stocks, and after the bill was filed the appellees sold the stocks, except 49 shares of Chicago City railway stock, at auction, as before stated, by which the indebtedness was reduced to $13,714.34.

The master reported the evidence, with his conclusions that all the transactions were a continuous series and were legitimate speculations and not gambling transactions, and that the appellants were not in a position, at the time of filing their bill, to claim the benefit of section 130 of the Criminal Code, which is the section prohibiting options. He recommended that the bill of complaint be dismissed for want of equity and that the prayer of the cross-bill be allowed. The cause was heard on exceptions to the report, and the court modified it by dividing the transactions between Mrs. Thompson and the appellees into three periods: The first, from their commencement to February 15, 1897; the second, from February 23, 1897, to September 30, 1898; and the third, from the latter date to her death. The court entered a decree reciting that the transactions down to September 30, 1898, were legitimate and that the transactions after that date were gambling transactions, but that the conduct of appellants as executors, and the course of dealing between them and the appellees from the death of Mrs. Thompson to the commencement of this suit, were such as to constitute a new contract between the appellants and appellees, by which the appellants were precluded from

receiving the benefits which might otherwise have accrued to them under the statutes respecting gambling. The court adopted the recommendation of the master but on different grounds, and dismissed the original bill for want of equity and granted the relief prayed for in the cross-bill. From that decree appellants removed the cause by appeal to the Appellate Court for the First District, and the branch of that court affirmed the decree.

In giving the reasons for an affirmance of the decree the Appellate Court stated that the appellants, knowing that the appellees held shares of stock of the market value of $180,000 at the death of Mrs. Thompson which they claimed to have bought for her, disposed of four-fifths in value of said stocks. The court expressed no opinion on the question whether such action fixed the character of the transactions or amounted to a new contract, but did express the opinion that the transactions were legitimate and not gambling transactions, which was conclusive of the case. The appellees did not assign cross-errors in the Appellate Court, and counsel for the appellants, pointing to the opinion, say that the appellees are precluded in this court from insisting that the transactions were legitimate. Their argument is, that the appellees not having assigned cross-errors in the Appellate Court, that court could not consider any question except whether gambling transactions could be ratified or confirmed by what the appellants did, and that the appellees cannot support the judgment of the Appellate Court except upon that ground. While the opinion of the Appellate Court shows the reasons which influenced that court to affirm the decree, it is the judgment, and not the opinion, of the Appellate Court that is under review now. Error cannot be assigned on the opinion, and the judgment could not be reversed if we should be unable to agree with reasons given for a correct decision. (*Pennsylvania Co. v. Keane,* 143 Ill. 172.) The decree of the circuit court dismissed the original bill for want of equity and gave to the

appellees the relief prayed for in the cross-bill. The reasons upon which that decree were founded were, that while the transactions subsequent to September 30, 1898, were gambling transactions, the appellants had so dealt with the stocks as to constitute a new and valid contract. It was not necessary that the decree should contain findings of fact, but a party obtaining affirmative relief must preserve the evidence upon which it is founded, either by a certificate of evidence or a recital of facts. If the evidence had been preserved by a certificate of evidence there could have been no assignment of cross-errors, and the appellees, who had obtained a decree in accordance with their claims, could not appeal from findings of the court embodied in the decree. *Corning* v. *Troy Iron Co.* 15 How. 451.

The purpose of the statutory assignment of cross-errors is to enable the court to finally decide the controversy without necessitating a separate appeal or writ of error. Formerly there was no right to assign cross-errors, but any party deeming himself aggrieved by a judgment or decree was compelled to take an appeal or sue out a writ of error. An appellee or defendant in error was not allowed to assign cross-errors except with the consent of the appellant or the plaintiff in error. (*Smith* v. *Sackett,* 15 Ill. 528.) In *Carter* v. *Moses,* 40 Ill. 55, the appellee asked leave to assign cross-errors, but the court said that in a chancery case an appeal brought the whole case before the court and it would be considered upon its merits without the assignment of cross-errors. In any case a party was permitted to prosecute a writ of error although the opposite party had appealed from the same judgment, and one of the proceedings did not affect the other but both might progress at the same time. (*Harding* v. *Larkin,* 41 Ill. 413.) In 1869 an act was passed which provided that the appellee or defendant in error should have the right to assign cross-errors, and the court should proceed in the disposition of the case in the same manner as when cross-errors were assigned by

consent. (Laws of 1869, p. 163.)   Afterward, in *Page* v.
*People,* 99 Ill. 418, where the question arose on demurrer
to a plea in bar of the writ of error, it was held that it was
optional with an appellee or defendant in error to assign
cross-errors or prosecute an appeal or writ of error sepa-
rate and independent of that of his adversary; that if a
party assigned cross-errors he could not afterward prose-
cute a writ of error upon the same record, but if he did
not assign cross-errors he was not barred from prosecuting
a writ of error.   In general, the cases holding that a party
can only protect his right by assigning cross-errors have
been where the decree or judgment did not give the party
all the relief that he claimed or gave to his adversary more
than he was considered entitled to, and where the appellee
or defendant in error might have taken an appeal or prose-
cuted a writ of error.   Examples will be found in *Johnston*
v. *Maples,* 49 Ill. 101, where the appellees claimed a larger
amount than was awarded them by the decree.   *Pool* v.
*Docker,* 92 Ill. 501, where the appellees, without assigning
cross-errors, asked the court to review a finding that there
was nothing due on account of rents when an allowance
ought to have been made on that account.   *Gage* v. *Davis,*
129 Ill. 236, where the appellee insisted that the amount
required to be paid as a condition to vacating the deeds was
too large.   *Haigh* v. *Carroll,* 209 Ill. 576, where the appel-
lee sought to question allowances to the receiver.   *Rodman*
v. *Quick,* 211 Ill. 546, in which case the appellees argued
that the court ought not to have given the right of redemp-
tion; and *Penn Plate Glass Co.* v. *Rice Co.* 216 Ill. 567,
and *Street* v. *Thompson,* 229 id. 613, where the appellees
attempted to question the refusal of the trial court to allow
interest.   Other cases of the same kind are *Hurd* v. *Asch-
erman,* 117 Ill. 501, *Hollingsworth* v. *Koon,* id. 511, and
*Vose* v. *Strong,* 144 id. 108.   If a party has not obtained
all that he deems himself entitled to he may appeal, but not
where he gets all that he claims.   (*Gray* v. *Jones,* 178 Ill.
241—15

169; 2 Ency. of Pl. & Pr. 157.) The statutory assignment of cross-errors, like the assignment of errors, is the pleading of the party and sets forth the grounds upon which the appellee or defendant in error seeks a reversal of the judgment or decree. The natural conclusion would be that such an assignment is only required where a party seeks a reversal of a decree or judgment and might have appealed or sued out a writ of error.

There is a class of cases where, as a matter of practice, assignments of cross-errors are necessary to have prejudicial errors against an appellee or defendant in error corrected upon a second trial in case the judgment should be reversed. If one party appeals the opposite party will be considered as acquiescing in all rulings of the trial court unless his objections thereto are presented in some proper manner, and if the judgment should be reversed a failure to assign cross-errors on alleged erroneous rulings might preclude the party from objecting to the same rulings on another trial. Such an assignment is only considered when the court has determined to reverse the judgment or decree, and then only to the end that there may be correct rulings on another trial. The practice in such cases has no relation to the controversy here. The appellees had a right to sustain the decree upon any facts in the record, whether the facts were the same as those found by the circuit court or not, and may sustain the judgment of the Appellate Court in like manner whether the reasons given in the opinion are good or not.

On the question whether the purchases and sales of stocks made by appellees on specific orders of Mrs. Thompson and the purchases and sales reported to and ratified by her were gambling transactions, the burden of proof was on the appellants. (*Clews* v. *Jamieson,* 192 U. S. 461.) The facts have been stated, from which it appears that the appellees received nothing from her except their commissions and interest on money advanced, and it is therefore

contended, on their behalf, that there could be no recovery in any event because they did not win anything from Mrs. Thompson and she did not lose anything to them. On the other hand, it is contended that the bill was filed under section 132 of the Criminal Code and that the rights of appellants are secured by that section. The whole subject of gaming is under legislative control in the exercise of the police power, which gives control over those things which may be injurious to the public welfare, and the legislature may enact statutes regulating or prohibiting gambling. (*Berry* v. *People*, 36 Ill. 423; *Booth* v. *People*, 186 id. 43.) In the exercise of that power the legislature by one section of the Criminal Code have set the seal of disapproval on bucket-shops as a form of gambling injurious to the public welfare, and by another section have prohibited options to sell or buy grain or other commodity or stocks, and by section 132 have provided for the recovery of moneys lost by any wager or bet upon any unknown or contingent event. Section 132 has been interpreted in several cases as giving a right of action against a broker for losses of his customer where the understanding between them is that there is to be a settlement, as between them, on differences, merely, which amounts to gambling, and the broker in such a case is to be considered a winner. (*Pearce* v. *Foote*, 113 Ill. 228; *Jamieson* v. *Wallace*, 167 id. 388; *Kruse* v. *Kennett*, 181 id. 199.) It seemed necessary to construe the statute in that way to reach the evil intended to be suppressed, and it must be regarded as settled law that if purchases of stocks are made by a broker with the understanding between him and his customer that there is to be no obligation on the part of the customer to take and pay for the stocks and that the customer is not to have the right to demand and receive the stocks, the broker is to be regarded as a winner of any money deposited with him and lost by the customer in the transaction. To make a transaction in stocks a gambling transaction it must appear that

neither party intended the stocks to be delivered or intended an actual purchase and sale but that both had the intention of settling on the differences, only.

Considering the question of fact, the transactions had the form of legitimate purchases and sales, and there was no evidence whatever of any understanding between the appellees and Mrs. Thompson that she was not to take or pay for the stocks purchased or deliver stocks sold, nor that there should be a settlement between them upon the differences in market values. Members of the firm called as witnesses by the appellants testified that there was no such understanding or agreement, and the only ground for claiming that there was an intent to gamble and settle by differences is that the transactions were of great magnitude in proportion to the wealth of Mrs. Thompson. The fact that the purchases during the period ran into millions of dollars is pressed upon our attention by counsel for appellants, and the fact that a purchaser is unable to take and pay for property is often of considerable importance in determining the nature of the transaction. The statement, however, is quite misleading without the explanation that while the purchases were for large amounts of stocks there were frequent corresponding sales, and it does not appear that there ever was a balance against Mrs. Thompson, above the market value of the stocks, which she could not pay. While the appellees bought a great many stocks they sold a great many, and at the death of Mrs. Thompson she could have paid for all the stocks, and her liability to appellees, above their value, was not large compared with her estate. The transactions were not contracts for purchases and sales where the subject matter was to be delivered in the future, which is a quite common form of gambling in grain and other commodities, and the inferences as to the intention to receive or deliver which attend such transactions are absent. Circumstances which would lead to the conclusion that the intention of parties was to settle on differences in market

value at the time for delivery would not justify a belief
that there was such an intention where stocks were actually
sold, delivered and paid for. We can discover no reason
for dividing the series of transactions into three different
periods and declaring those after September 30, 1898, to
be different from the previous ones. The only difference
was that certain of the appellees were authorized, as agents
for Mrs. Thompson, to use their own discretion in buying
and selling without a specific order, but when each purchase
or sale was made it was reported to her the same day and
in every instance ratified. There could have been no dif-
ference in the understanding between the parties, based on
the facts. There were times when appellees held stocks of
greater value than Mrs. Thompson would have been able
to take and pay for with her other estate, but the stocks
were good security for something near the purchase price
of them, and if they were taken into account there was no
time when she could not have paid the balance. We are
of the opinion that the whole series of transactions were
legitimate and were not gambling transactions.

At the death of Mrs. Thompson the appellees had on
hand stocks purchased by her which could have been sold
for $173,000, and the appellants took control of the same
and directed the disposal of them. The appellees had paid
Mrs. Thompson over $50,000 as profits of the transactions
conducted by them, and if appellants had then disaffirmed
the transactions as of a gambling nature they would have
had no claim or demand against the appellees. If the trans-
actions had been gambling transactions the appellants might
have disaffirmed them, but if they had done so they would
not have been entitled to recover anything, for the reason
that the account then stood with a profit. There was a dif-
ference between the market value of the stocks on hand and
the amount of the indebtedness, but more than that had
been paid to Mrs. Thompson as profits. The appellants did
not allege in their bill, and do not claim, that they were

gambling, and the losses on the whole series of transactions occurred during the period of seventeen months during which they demanded and received deliveries of stocks. The transactions, if criminal in nature, could not be ratified. (2 Pomeroy's Eq. Jur. sec. 964.) But that is not the question here. As the appellants were not gambling and the losses resulted from the depreciation of the stocks while under their control, they could not recover such losses under section 132 of the Criminal Code.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*

Mr. JUSTICE HAND, dissenting.