John D. Ames, Executor of the Last Will and Testament of Knowlton L. Ames, Deceased, et al., Appellants, v. Henry W. Farnum et al., Appellees.

Gen. No. 38,153.

Opinion filed April 22, 1936.

WALTER W. Ross, of Chicago, for certain appellant.

WILSON & MCILVAINE, of Chicago, for appellees;
J. F. DAMMANN and W. P. GILBERT, both of Chicago,
of counsel.

MR. PRESIDING JUSTICE HALL delivered the opinion
of the court.

This is an appeal from a judgment of the circuit
court of Cook county, allowing a claim against the
estate of Knowlton L. Ames, deceased, in the sum of
$379,561.65. The cause was tried by the court without
a jury, on appeal from the probate court of Cook
county. The hearing was had on an amended claim
filed in the probate court by Farnum, Winter & Com-
pany, stockbrokers, a copartnership, consisting of
Henry W. Farnum, Wallace C. Winter, Jesse Spald-
ing, Paul E. Gardner, Herbert L. Jones, John Cole-
man, Jr., John Tucker, Vaughn C. Spalding and James
M. Sheldon, doing business as Farnum, Winter & Com-
pany. The claim as filed, was for $360,000, and was
based on an account stated between Farnum, Winter
& Company and Knowlton L. Ames, decedent, of date
May 31, 1931. By the account stated, Ames acknowl-
edged himself indebted to the plaintiffs in the sum of
$420,237.46. After hearing a large amount of testi-
mony, the court allowed the claim for the amount men-
tioned, which included interest in the sum of $19,503.16,
from January 31, 1932. No question is raised as to
the amount of the judgment.

Ames's bookkeeper, who was produced by plaintiffs,
testified that on May 31, 1931, the date of the account
stated, Ames's books showed that he was then indebted
to the claimants in the sum of $420,237.46.

It is not claimed by the defendants that Ames in his
lifetime did not acknowledge in writing, his debt to the
claimants in the amount mentioned. The claim of de-
fendants is that the transactions between Ames and
the claimants, upon which the claim is based, were
gambling transactions, within the meaning of sections

130 and 131, paragraphs 308 and 309, chapter 38, Cahill's Illinois Revised Statutes, 1933, and were, therefore, illegal and void, and that no recovery could be predicated upon them.

The auditor of Farnum, Winter & Company testified that he prepared a statement of the account of Ames with claimants as of May 31, 1931, and mailed it to Mr. Ames, who returned it to the plaintiffs with an acknowledgment of its correctness and signed by Ames. The document, signed by both parties, is as follows:

"FARNUM, WINTER & Co.
120 West Adams St.
Telephone Randolph 8910
May 31, 1931

"K. L. Ames,

"In connection with the audit of our books and accounts as of this date, please verify the correctness of your account as shown by statement hereto attached, noting any exceptions thereto, and returning signed acknowledgment in enclosed stamped return envelope.

"Very truly yours,
"Farnum, Winter & Co.

| Debit Balance $420,237.46 | Credit Balance $ |
|---|---|
| LONG | SHORT |
| 10130 Murray | |
| 6600 Booth Fish Pfd. | |
| 20000 Booth Fish Comm. | |

"Farnum, Winter & Co.,
Chicago.

"The money balance and security position of this account is correct as shown above.

"Sign here   K. L. Ames"

The record shows that subsequent to the making and execution of the statement of account, there were no transactions between the parties, other than the sale

of certain securities held by claimants as security for moneys due them from Ames. Such sales were made by the claimants in accordance with an authorization given by Ames of date June 10, 1931, as follows:

"I hereby authorize you to sell any of my securities which you are carrying in my account at any price which you may think is the best to be obtained under the conditions at the time. I hereby assume full responsibility for the balance due you after disposition of these securities."

These sales were subsequently approved in writing by Mr. Ames, and he received credit for the proceeds thereof. Prior to the execution of the account stated, claimants received a letter from Ames, which was sent after Ames received word that the complainants were selling certain stocks held by them as security for monies owed to them by Ames, dated June 15, 1931, as follows:

"I think you have been very decent and generous in carrying the stock as long as you have, and, of course, did it with the idea of helping you work out the balance due you through an advance in the Murray stock. I authorized Mr. Winter of your company in the spring of 1930 to sell all of my Murray at that time as he might think best, and as I recall about 800 to 1,000 shares were sold at twenty-five and the sales were discontinued. . . . I am not writing you for any personal consideration because your firm has given me more consideration than I deserve, but if I were writing you regarding someone else under the same conditions I could not help but suggest to you that perhaps, all things considered, the best way to collect an indebtedness similar to mine would be to continue to carry the stock if you can possibly see your way clear to do it, and this would be my suggestion no matter who it might be in the same position. Your explanations, however, are just as reasonable as mine and are more important and vital to your own interests than mine

are. Of this no one can be a better judge than yourselves. Please remember that I am making no complaint and only a suggestion. I, of course, am exceedingly sorry about the condition of my account and about the conditions which make you decide to sell the stock, and my appreciation and gratitude of your friendliness is not and cannot be changed by anything you find necessary to do, and I give you the right to do it without any recourse on my part whatever.''

The claim that the transactions between the parties were gambling, and, therefore, contrary to law and in violation of the statute, is based on the charge that none of the transactions between Ames and Farnum, Winter & Company were intended to be, or were, settled by actual delivery of stocks bought or sold, but by the payment of differences in market prices, and that certain agreements with reference to a ''Murray Syndicate'' were in violation of the statute, and evidenced the intention of Farnum, Winter & Company that there should be no delivery of stocks bought or sold, but merely a payment of difference of market prices.

At the time of the transactions in question, Knowlton L. Ames was a man of mature years, was prominent in a number of large business enterprises, including a newspaper known as the Chicago Journal of Commerce. Ames and Farnum of the claimant firm had been friends for many years, and Ames had engaged in the purchase and sale of securities through this firm and other firms for upwards of 20 years prior to his death, and his dealings in such commodities during all this time are shown to have been very extensive.

Henry W. Farnum, a member of the claimant firm, was produced as a witness by the defendant. His testimony was to the effect that Ames became a customer of the firm some twenty years prior to the date of the trial. It is here to be noted that among the stocks dealt in between Ames and the claimants, were those of the Murray Corporation of America and the Murray

Body Company. Farnum testified to the effect that he became a director of the Murray Corporation of America in the year 1927, and that such corporation was listed on the New York Stock Exchange on January 26, 1927; that the business of this company was the building of automobile bodies; that during the year 1927, many shares of stock of the Murray Corporation of America were transferred through his firm.

Farnum testified as to the purchases and sales of stocks of various sorts, made by Ames through claimants; that various purchases, sales and deliveries of these stocks were made through the claimants on orders from Ames, and that in each of such transactions there was immediate delivery of the stock certificates. Other transactions between the parties testified to by Farnum were those of purchases and sales of stock made through the New York Stock Exchange. He testified to the effect that when Ames placed an order with his firm, that the order was noted on their books and by wire transmitted to the New York office of the claimants; that the order was executed on the floor of the New York Stock Exchange, and if there was a purchase of stocks, the purchase was made there, and under the rules of the exchange, that there had to be an actual delivery of the stocks within two days of the date of the sale, and that all such deliveries were made. The evidence indicates that in some cases, stock so purchased by Ames was given into his physical possession, but that in most cases, they were held by the claimants as security for balances then owed by Ames to them, and that claimants frequently, under the regular course of procedure followed by brokerage houses under such circumstances, pledged these stocks with banks, so that the banks carried the amount of Ames's indebtedness instead of it being carried by claimants. In many instances on Ames's own order, stocks held by claimants as security for balances owed by Ames to

complainants, were ordered transferred by Ames to certain banks, who became Ames's creditor, and these banks in turn took up the balances owed by Ames to the claimants. It is also in evidence that by the books of complainants, it is shown that in all instances of purchases or sales made by Ames through brokers, they were made on Ames's orders, and the stocks involved were actually transferred. One of the accounts carried by claimants on their books of the Ames transactions was known as the "K. L. Ames Option and trading account" and it is insisted by defendants that the very title of this account is evidence of the fact that the deals were made on options, and that there was no intention of delivering any stocks, but that settlement would be made on balances. The record shows that this account was kept in this way by Ames's direction, because of the fact that he had instructed the firm of Thomson & McKinnon to buy certain stocks in the name of "K. L. Ames Option and trading account." Ames told plaintiffs that he desired the account kept in this way because he wanted "to keep this account separate, as I have some stock to deliver on an option which I gave." There is nothing to show that claimants had anything to do with any such "option," if such there was.

In further explaining the deals between the parties, Farnum testified that Ames had many accounts with the claimants, and the books of the firm identified by Farnum show many purchases and sales of various stocks. He testified that Ames began trading with the firm in December, 1927; that various purchases, sales and deliveries of stocks were made through claimants on orders from Ames; that in all cases of purchases of stocks made by the claimants for Ames through the New York Stock Exchange, the stocks were delivered to either the New York office of claimants, or to their agent in New York; that Ames did not at all times pay

in full for the stock that was purchased by him, and that whenever he did not pay in full for the securities, the claimants, as already stated, borrowed money from banks for his account, and charged him interest on it; that when they borrowed from the bank, they did not borrow in the name of Ames, but in their own name; that Farnum, Winter & Company first became interested in the Murray Body Corporation in 1924; that they purchased 45,000 shares of the Murray Body Corporation in 1924, none of which was sold to Ames; that thereafter Ames and his associates acquired a quantity of shares in the Murray Body Corporation and Ames became a director in the company, and at that time claimants had sold all of the shares of the company with which they had do to. He testified to the effect that his firm were members of the New York Stock Exchange during all the period when they were acting as brokers for Ames; that there was a rule of the exchange in force at that time with reference to making delivery of stocks that were purchased for customers, which was that they be delivered the next day by the seller to the buyer; that that is done through the Clearing House, which is simply a method of making it easier for the houses to deal, to deliver securities and pay for them; that if his firm purchased a number of shares for a customer, and if they sold another number of shares for a customer today, and purchased more than they sold, they would put a slip into the Clearing House showing the net transactions in that security for that day; that if they purchased more than they bought, they would accompany the slip with a check; if they sold more than they bought, they would make a claim on that slip and would receive a check from the Clearing House; that the certificate of stock would be delivered by the Clearing House to the purchaser, that is, if they bought more than they sold; that if they bought 1,000 and sold 800 shares they

would have 200 delivered to themselves; that here is what they would do to take care of the other 800 they had bought for clients—his account would be charged with the 1,000 shares just as though they had sold no stock at all, and the customer selling 800 shares would receive credit for 100 as though they had bought no stock at all. To further illustrate the method pursued by claimants in connection with transactions on the New York Stock Exchange, the witness testified as follows: "Suppose we had a number of purchases equalling 1,000 shares, and we had a number of sales equalling 800 shares, then the Clearing House would have delivered us only 200 shares. As to the other customers that made up the other 800 that were bought, their account would be treated exactly as though there had been no clearing house. They would get the 800 that had been sold. The actual certificates for all the 1,000 shares would be held to the account of those who had purchased. A record of every certificate is kept in our record books. As to Mr. Ames's account, whether the shares had been bought or sold by our firm or not, the record is clear on the subject of the number of the certificate which is bought for each customer. That would be kept in the record of the clearing house as a sale. I do not know whether the record of the certificate that was caused to be delivered would be kept on the record of the clearing house, but it certainly would be in our record. There is a difference between receiving an order to be filled in a security listed on an exchange if we received an order to be filled it must go to the exchange; it does go to the exchange; it is filled there, but we may receive instructions from a customer to take over from a bank 1,000 shares of this stock for so much money; we may receive instructions from a customer to take over from another house in our business or from whomsoever he pleases securities at a price, as taken over and accounted for, that is

quoted by the man filling the order. There is one item here of 1,000 shares which evidently was not transacted on the Stock Exchange, but where we took over 1,000 Murray Company for about $45,000 for Mr. Ames's account on his instructions. From whom that was taken, I could not say without looking into the record, but the record will show. There was an absolute delivery of 1,000 shares. Our record will show the certificate number of each one of those, but with reference to the others, except that one, all of them were orders filled on the Stock Exchange. Yes, they were all filled. I can tell that they were filled because when any item appears on these statements 'received' that means that it was not an order completed on the Stock Exchange. Where we received or delivered the shares and that is marked 'received' for so much money, that means it was not shown because no price is put against it. But in those cases, we received the actual certificates. With reference to all of these other transactions that were filled in every case where the orders were filled on the exchange, deliveries were taken by us of the certificates of stock. They were held by us subject to the order of Mr. Ames. The certificates were either in our possession and at the bank, or with an agent, where we had put them.'' While testifying, this witness had claimants' books before him, and he testified to the effect that the books of claimants show an account of every certificate of stock bought or sold on Ames's account, and that Ames made a profit in the Murray Body transaction of around $80,000. He further testified that claimants had no interest in the Murray Body Syndicate; that prior to that time, they had bought 45,000 shares of this stock from Eastman, Dillon & Company; that the records of the claimants show the purchases of the Murray Body stock for Mr. Ames from the time of the original purchase made for his wife in 1927, and it is in evidence

that they, as his brokers, always had the certificates of stock for Mr. Ames's account, and that it was a fact that they did have such certificates, either in person, or pledged to the bank.

There is nothing in the record to dispute the testimony of Farnum to the effect that the stocks bought and sold were actually delivered, except that of Louis J. Berg, who was bookkeeper for Ames during all the times in question, and who testified that he received month to month statements of Ames's accounts from the claimants, and that he checked them and put them on the books, and filed them away. He testified as to many purchases and sales of various securities made for and on account of Ames through these claimants from April, 1928, to October 21, 1929, and that as to most of them, Ames's books showed that no deliveries were made to Ames of any of these stocks.

It may well be that this is true, and that there were few actual physical deliveries of the stock to Ames, for the reason, as the record indicates, that Ames owed these brokers large amounts of money, for which the stocks were pledged and for which they were held as security. There seems not to have been any balancing up, or settlement made between the parties, but when the transactions were closed, Ames admitted that he owed claimants upwards of $420,000.

As stated, it is insisted by defendants that certain persons entered into an illegal syndicate, or pool, in an attempt to corner the market, or elevate the price of the stock of the Murray Body Corporation, and that such agreement was illegal and is evidence of the character of the transactions between Ames and the claimants. While the record shows that Ames was a party to such a pool which was organized for the purpose mentioned, there is no evidence to indicate that the claimant firm had any connection with this pool. While it is shown that one Spalding, a member of the claim-

ant firm, was a party to this agreement, having for its object the boosting of the stock of this corporation, as claimed by defendant, the record indicates that all the transactions in connection therewith were had through New York stockbrokers. Further, the record clearly indicates that no transaction involving this so-called "Murray Syndicate" had any connection with any of the items mentioned in the account stated, upon which this action is brought. While the statement submitted by claimants to Ames mentions "Murray" as one of the items on which Ames was indebted to claimants, there is nothing to show that this purchase was not made for Ames in the regular course of his business with claimants, as testified to by Farnum.

Pars. 308 and 309 of the Criminal Code, Ill. State Bar Stats. 1935, ch. 38, upon which the defense here is predicated, are as follows:

"Whoever contracts to have or give to himself or another the option to sell or buy, at a future time, any grain, or other commodity, stock of any railroad or other company, or gold, where it is at the time of making such contract intended by both parties thereto that the option, whenever exercised, or the contract resulting therefrom, shall be settled, not by the receipt or delivery of such property, but by the payment only of differences in prices thereof, or whoever forestalls the market by spreading false rumors to influence the price of commodities therein, or corners the market, or attempts to do so in relation to any such commodities, shall be fined not less than $10 or more than $1,000, or confined in the county jail not exceeding one year, or both; and all contracts made in violation of this section shall be considered gambling contracts and shall be void."

"All promises, notes, bills, bonds, covenants, contracts, agreements, judgments, mortgages, or other securities or conveyances made, given, granted, drawn or entered into, or executed by any person whatsoever,

where the whole or any part of the consideration thereof, shall be for any money, property or other valuable thing, won by any gaming, or playing at cards, dice, or any other game or games, or by betting on the side or hands of any person gaming, or by wager or bet upon any race, fight, pastime, sport, lot, chance, casualty, election or unknown or contingent event whatever, or for the reimbursing or paying any money or property knowingly lent or advanced at the time and place of such play or bet, to any person or persons so gaming· or betting, or that shall, during such play or betting, so play or bet, shall be void and of no effect.''

In *Pelouze v. Slaughter*, 241 Ill. 215, a woman named Thompson had bought and sold stocks through the brokerage house of Slaughter & Company of Chicago. Subsequent to her death, suit was brought against Slaughter & Company by her executors to recover possession of stocks held by them, and the executors based their right of recovery upon the charge that such stocks were received by Slaughter & Company through gambling transactions between Slaughter & Company and Mrs. Thompson. The defendants, Slaughter & Company, presented a cross-bill, in which it is alleged that Mrs. Thompson was indebted to them on account of purchases of stocks which were only partly paid for, and against which indebtedness to them and as security for the same, defendants held the stock which she sought to recover in her suit. In the cross-bill, it was also alleged that the stocks had been sold, leaving a balance due cross complainants, and that the debt of Mrs. Thompson amounted to the sum of $13,000, which they sought to recover in their cross-bill. From the statement of the case, it appears that the facts in that case were similar to those in the case at bar. Upon a hearing, the court dismissed the original bill and granted the relief prayed for in the cross bill. From the decree an appeal was prayed to the Appellate

Court of the First District, where it was affirmed, and the Supreme Court affirmed the Appellate Court. In its opinion, the Supreme Court said:

"On the question whether the purchases and sales of stocks made by appellees on specific orders of Mrs. Thompson and the purchases and sales reported to and ratified by her were gambling transactions, the burden of proof was on the appellants. (*Clews v. Jamieson,* 192 U. S. 461.) . . . Circumstances which would lead to the conclusion that the intention of parties was to settle on differences in market value at the time for delivery would not justify a belief that there was such an intention where stocks were actually sold, delivered and paid for."

We are of the opinion that defendant has failed to establish the fact that the transactions here were in violation of the statute, and we find nothing in the record which would justify a reversal of the judgment. Therefore, the judgment is affirmed.

*Affirmed.*

HEBEL, J., and DENIS E. SULLIVAN, J., concur.