(No. 25604.—
ARMIN F. HILLMER *et al.* Appellees, *vs.* THE CHICAGO BANK OF COMMERCE *et al.*—(J. N. CANAVAN *et al.* Appellants.)

*Opinion filed Dec. 16, 1940—Rehearing denied February 5, 1941.*

MATTHEWS, HARMON, KARR & SPRINGER, JOHN K. NOTZ, HOPKINS, SUTTER, HALLS & DeWOLFE, ISHAM, LINCOLN & BEALE, WILSON & McILVAINE, MARKHEIM, PARKER & MILLER, MAYER, MEYER, AUSTRIAN & PLATT, POPE & BALLARD, McDONALD & RICHMOND, WILLIAM F. PRICE, THOMAS G. DEERING, and SHULMAN & ABRAMS, (KENNETH L. KARR, J. F. DAMMANN, FRANK D. MAYER, KENNETH F. MONTGOMERY, DONALD J. DeWOLFE, BECHER W. HUNGERFORD, MARSHALL SAMPSELL, and FLOYD E. THOMPSON, of counsel,) for appellants.

ORR, SULLIVAN & RICKS, LEONARD & LEONARD, SEYFARTH & ATWOOD, OWENS & OWENS, and RUSSELL, MURPHY & PEARSON, (WARREN H. ORR, GEORGE E. LEONARD, KARL E. SEYFARTH, THOMAS L. OWENS, and WALTER P. MURPHY, of counsel,) for appellees.

Mr. JUSTICE FARTHING delivered the opinion of the court:

This representative suit was brought by appellees on behalf of themselves and all other creditors of the Chicago Bank of Commerce, to enforce the liability imposed by section 6 of article 11 of the Illinois constitution on State bank

stockholders. By the amended and supplemental complaint in chancery it was alleged the Chicago Bank of Commerce commenced business April 5, 1930, and that at that time its capital stock was $3,000,000, divided into 30,000 shares of $100 par value; that January 13, 1931, the stockholders, at a meeting duly convened and held, adopted a resolution to reduce the par value from $100 to $50 a share, and to decrease the capital stock from $3,000,000 to $1,500,000, represented by 30,000 shares of $50 par value; that a certificate of approval issued by the Auditor of Public Accounts of Illinois was filed in the office of the recorder of deeds of Cook county, Illinois, on February 7, 1931; that this certificate recited this action was taken in accordance with the provisions of section 12 of the Illinois Banking act; that, thereafter, 30,000 shares of capital stock of par value $50 were duly issued and delivered to the stockholders of said bank. June 25, 1932, the bank was closed by order of the Auditor of Public Accounts, a liquidating receiver was appointed, and he filed a suit in the circuit court of Cook county to liquidate the bank, which suit is still pending. The prayer was the stockholders be held liable for the bank's liabilities which accrued during their respective periods of stock ownership.

The master in chancery's report contains a detailed discussion of whether the decrease in the par value of the capital stock was valid and effective. The master concluded: "I am therefore of the opinion and find that the reduction of the par value of the stock of the Chicago Bank of Commerce was effective against future creditors, but ineffective against past creditors, and in determining the liabilities of the defendants herein, I have computed their liabilities for all unpaid indebtedness accruing during their ownership of said $100 par value stock at a maximum of $100 per share. After the reduction of said stock to $50 per share, I have computed their liabilities for all unpaid indebtedness accruing during their ownership of said $50 par value stock at a

maximum of $50 per share. I find, however, that the reduction in the capital stock and the issuance of a new $50 par value stock for the old $100 par value stock did not constitute a transfer of stock or ownership of new or additional stock, and I have therefore considered the ownership of said stock as a continuous one and in no case have I computed the liabilities attaching to a share of $100 par value stock, for which a share of $50 par value stock was substituted, at a sum in excess of $100 per share." The master refused to separate the indebtedness into periods corresponding to the several periods of stock ownership so that the report would show which stockholders were liable for debts of the bank accruing during any period of ownership.

The master filed his report April 7, 1937, and on the same day an order was entered that all objections stand as exceptions. April 16, 1937, this court rendered its opinion in *Burket* v. *Reliance Bank and Trust Co.*, 366 Ill. 98. May 11, 1937, certain defendants, who were later joined by all who have appealed, petitioned for leave to file a cross-bill, and in the petition cited the *Burket case.* The petition alleged petitioners held stock when it had a par value of $100; that the unsatisfied liabilities which had accrued before the reduction in par value were $79,417.60 and these had been reduced to $59,563.20 by a twenty-five per cent dividend paid by the Auditor's liquidating receiver; that after the reduction in par value the liabilities of stockholders for all unpaid indebtedness should be computed at a maximum of $50 per share; that after the institution of this proceeding, and before this petition was filed, stockholders holding during the $100 par period had paid in $69,766, either on account of shares held only during said $100 par period or in excess of the $50 par on shares held during both periods, and that this was more than all the unsatisfied liabilities which had accrued during the $100 par period. By applying all payments in excess of $50 per share to reduce the liabilities accruing while the stock was of $100 par value,

as was alleged should be done under authority of the *Burket case,* petitioners reached the conclusion there was no warrant of law requiring further payments on account of these liabilities. Leave was granted and the cross-bill was filed setting forth the above facts.

The reply to the cross-bill quoted section 12 of the Illinois Banking act and asserted that section, properly construed, prohibited the purported reduction in par value, and if construed otherwise, it was unconstitutional by reason of section 6 of article 11 of the Illinois constitution. It also alleged the matters set forth in the cross-bill came too late to merit consideration of the court. It further alleged that at the time of the reduction of the par value of stock a distribution in cash was made and paid to each of the stockholders amounting to $80 per share and totaling $2,400,000; that this was a violation of section 11½ of the Banking act. It further asserted that by reason of having received this unlawful dividend defendants were estopped to set up the purported reduction in par value of the stock, and that defendants should be estopped to set up the defense of payment until they offered to do equity by returning the aforementioned illegal distributions. The chancellor overruled appellants' motion to strike the reply, sustained the reply and dismissed the cross-bill. After this, the court permitted the same defendants to file additional exceptions to the master's report setting forth the same contention, that payments by contemporaneous stockholders had extinguished the liabilities of these defendants. The chancellor overruled the exceptions, and entered a decree in conformity with the master's report. The decree recited the procedure by which the par value of the stock was reduced and the payment to the stockholders of $80 per share, and stated the master found the Banking act in force at the time permitted such decrease, and the reduction was accomplished in accordance with the statute and with the consent and approval of the banking authorities of the State, and "The master there-

upon found that the reduction of the par value of the stock of the bank was effective against future creditors but ineffective against past creditors." Some of defendants were held liable for $100 per share. On appeal, this decree was affirmed by the Appellate Court. We have granted an appeal from that judgment.

The first question confronting us is the effect of the reduction in the par value of the stock from $100 to $50 per share. Appellants claim the decree of the superior court held it was valid and effective, and since no appeal was taken from this portion of the decree and no cross-error assigned on this ruling, the question of the correctness of that part of the decree is not before us. With this we cannot agree. A party who obtains a decree in full accordance with his claims, as here, has no right or need to appeal from findings of the court embodied in the decree, and an appellee has a right, without assigning cross-errors on the findings of the decree, to sustain it upon any facts in the record, whether they are the same as those found by the decree or not. (*Pelouze* v. *Slaughter,* 241 Ill. 215.) On the other hand, appellees maintain that in sustaining their reply to the cross-bill, which reply set forth the invalidity of the proceedings relating to the reduction in par value and that appellants were estopped to rely on that action, and in dismissing the cross-bill, the court held in accordance with the position of appellees; that no appeal was taken from this order, and, therefore, appellants cannot now question the correctness of that ruling. This contention cannot be sustained. The court permitted appellants to file additional exceptions to the master's report embodying the same contentions as those advanced in the cross-bill after it had been dismissed and these exceptions were later overruled. The question was thus preserved in the record and is now before us. Under section 74 of the Civil Practice act (Ill. Rev. Stat. 1939, chap. 110, par. 198) an appeal is not limited to any specific order, but the entire record is

before us for review, and any erroneous action of the lower court may be corrected if the point is properly reserved.

Appellants argue that this court cannot consider the question of whether the reduction in par value, coupled with the distribution of $80 per share to the stockholders, was illegal, for the further reason that no such issue was raised by the pleadings. The record shows no claim of invalidity was made in the complaint. It appears, however, from the report of the master that it was argued before him, and after appellants had raised the contention in their cross-bill that their liabilities were extinguished by payments by contemporaneous stockholders, the reply thereto of appellees charged the reduction was invalid and that there was an estoppel to raise this defense because defendants had received $80 per share in connection with this reduction. This reply was sustained and exceptions to the report of the master incorporated the matters set forth in the cross-bill. The question, therefore, was raised in the pleadings and is properly before us.

The position of appellees is that the reduction of capital stock, and the concomitant distribution of capital, violated the Illinois Banking act, and that if it be held the Banking act authorized such action the statute is unconstitutional as in violation of section 6 of article 11 of the Illinois constitution. Appellees quote from section 11½ of the Banking act (Ill. Rev. Stat. 1939, chap. 16½, par. 11(a)): "No bank or banking association organized under this act shall during the time it shall continue its banking operations withdraw or permit to be withdrawn, either in the form of dividends or otherwise, any portion of its capital, * * * and no dividends shall ever be made by any such bank or banking association while it continues its banking operations to an amount greater than its net profits then on hand, deducting first therefrom its losses and bad debts, * * * but nothing in this section shall prevent a reduction of the capital stock of a bank or banking association

under section 12 hereof." The contention is that this was a capital dividend and also was not a dividend out of net profits, as required by this section. However, section 12 provides: "Whenever the board of directors * * * · of any corporation having any banking powers * * * may desire * * * to increase or decrease or change the par value of the capital stock * * * they may call a special meeting of the stockholders of such corporation for the purpose of submitting to a vote of such stockholders the question of * * * increase or decrease or change in par value of capital stock; * * * provided * * * that in no case shall the capital stock be diminished to the prejudice of the creditors of such corporation," etc. Counsel for appellees state that the act authorized a reduction of capital stock, but that it did not authorize a distribution of capital to stockholders. In our opinion the proviso to section 11½, that nothing in the section shall prevent a reduction of capital stock under section 12, was inserted for the purpose of permitting that part of the capital of a bank set free by a voluntary reduction of capital stock to be distributed by way of a liquidating dividend. Nor can we agree with appellees' contention that the transaction caused the bank's capital to be diminished to the prejudice of creditors and was, therefore, void. In this connection they argue that the bank statement of December 31, 1930, showed that the bank then had $1,650,000 cash on hand, and that approximately six weeks later $2,400,000 in cash was distributed to the stockholders; that although notice of the capital stock reduction was published in the Chicago Daily Law Bulletin, no notice was given of this distribution of cash to the creditors; that this was in fraud of both existing and subsequent creditors; that the court will take judicial notice this occurred in the midst of an economic depression, and that the action of the bank's directors and stockholders in distributing to themselves cash and liquid assets amounting to more than half of the deposit liabili-

ties was necessarily bound to seriously impair prospects for the bank's weathering the storm; that the transaction was a preference of themselves by trustees out of trust funds. As appellants point out, this issue was not raised in the original pleadings and the evidence introduced before the master was not directed to it. They say that the bank's cash position six weeks before the distribution is of little significance. That same record shows the bank was entirely solvent at that time and that its total assets of $9,579,590.47 exceeded its liabilities to creditors by $5,083,151.58. It is not alleged or proved, as charged by appellees, that this cash for distribution was obtained by sacrificing its best assets at depression prices, or for that matter how the cash was obtained. Appellants also point out that this distribution was made seventeen months before the bank closed and only ten months after it had commenced business, and that the bank statement for the following year, December 31, 1931, after the distribution, showed the bank to be solvent. It is also pointed out as evidence that the bank was solvent after the distribution, that the Auditor of Public Accounts approved the reduction with knowledge the distribution was to be made. As to the notice to subsequent creditors, appellants answer that an affidavit stating the facts in regard to the cash distribution was recorded in the office of the Auditor of Public Accounts, February 7, 1931. We conclude the Banking act authorized this reduction in capital stock and the distribution of cash to the stockholders, and that the record does not show this amounted to an impairment of the capital of the bank.

In support of their contention that the statute, so construed, violates section 6 of article 11 of the State constitution, which provides every stockholder shall be individually responsible over and above the stock so held by him to the par value thereof, for all the unsatisfied liabilities of the bank accruing while he or she held such stock, appellees argue that if this distribution is held valid, then all

stockholders need ever do to defeat the constitutional liability imposed upon them is to distribute the assets of the bank among themselves shortly before the Auditor takes charge and they will then have enough money or securities to pay their stockholders' liability. The difficulty with this argument is that it assumes a factual situation which is not shown to have existed here. There is no proof the bank was in failing circumstances at the time of this distribution. That contention must be overruled.

Appellees insist that appellants are not entitled to have the excess of $50 per share paid by other stockholders applied to reduce only the liabilities which accrued before February 7, 1931, because, prior to the entry of the decree, all parties had agreed on a different theory of application of payments—a *pro rata* payment to all creditors—and had applied them accordingly, and appellants are now bound by such application. They say the thirty-five per cent dividend which had been paid prior to entry of the decree included thirty per cent paid from funds arising out of the liquidation of the bank, and five per cent paid from funds collected from the stockholders. The appellants say they made no such agreement as that claimed. Appellees do not point out any proof of any such agreement and we are bound to conclude there was none. Appellants had the right to and did appeal from the decree. In their briefs they do not claim the benefit of the five per cent dividend paid to creditors out of moneys collected from stockholders because of their constitutional liability. What appellants do insist upon is that under the *Burket case,* liabilities that accrued during a particular period of ownership must be reduced by the thirty per cent dividend paid from the bank's assets, and also by payments made before the decree by those who held stock in that period. They say they do not claim and it is not necessary for them to claim any benefit from the five per cent dividend paid to creditors generally

out of such moneys so collected. Further, they say that the amounts paid by holders of stock of $100 par value who never held stock of $50 par value, and payments by those who held both kinds of stock, added to the thirty per cent dividend, entirely obliterated the liabilities that accrued before the stock was changed to $50 par value. In making this claim they allot to the $100 par-value-period, from the payments made by the stockholders who held stock of both $100 and $50 par value, only· the excess of $50 a share.

Appellees next assert that while the extent of the liability of stockholders who held stock both before and after the reduction of capital stock was in dispute, many who held in both periods entered into compromise settlements of their liabilities for seventy-five dollars or other amounts in excess of $50 per share; that such payment made in settlement of a *bona fide* dispute as to the amount due, accepted by the creditor, was a satisfaction of the claim. They then argue the payments of the stockholders should be applied *pro rata* to discharge unsatisfied liabilities due all creditors, citing *Heine* v. *Degen*, 362 Ill. 357. This position results from a confusion of two separate and distinct principles of law. It is true that under *Heine* v. *Degen, supra,* the moneys collected from the stockholders must be distributed ratably to all the creditors, and not merely to those whose claims arose during the period of their stock ownership. However, in *Burket* v. *Reliance Bank and Trust Co. supra,* a different question was involved. The rule laid down in that case is that the liability of a stockholder is limited by the amount of the debts of the bank accruing during the period of his stock ownership and is discharged by payment to the receiver in the representative suit of an amount equal to those debts by stockholders holding during that period. We, therefore, hold the maximum liability of a stockholder holding dur-

ing both periods of par value was $100, but it was enforceable at $100 per share to the extent of debts accruing before February 7, 1931; as to debts accruing after that date it was enforceable at a maximum of $50 per share. Payments in excess of $50 by those holding during both periods must necessarily have been paid to reduce liabilities accruing before the reduction. By so applying such excess, the liabilities accruing during the $100-par-period have been wiped out as a measure of damages through payments by other contemporaneous stockholders and the thirty per cent dividend, hence, appellants cannot now be held liable for them. In assessing their liability at $100 per share the superior court and the Apellate Court erred.

Appellants contend that under section 6 of article 11 of the constitution, the appellees had the burden of proving the essential elements of the case to establish the liabilities of the stockholders. They say that appellees had to prove (1) who were the creditors of the bank, (2) what were the unsatisfied net liabilities of the bank to each of its creditors, and (3) when these liabilities respectively accrued, and that they failed to sustain this burden. In short, appellants contend that appellees were bound to prove the net amount due to each creditor, after allowing all credits, set-offs, and counter-claims in favor of the bank. Appellees insist the burden was not on them to show either offsets or payments. According to the theory of the appellants, the audit introduced in evidence was incorrect, because it considered merely the liability side of the bank's books. In answer, appellees point out that the matter of bank's assets,—i. e., offsets against bank liabilities, are shown in the books of the bank and its receiver, and such claims as had been allowed and paid were, in fact, used to reduce the liabilities. The audit was made at the bank premises from the books of the bank showing liabilities. The accountant first set up all the liability accounts, apply-

ing the "first in, first out" rule to savings and checking accounts. The accounts were identified and transcribed, showing the respective balances due when the bank closed. To the amount of the last deposit was added the last prior deposits sufficient to equal the amount of balance due the depositor. From this information was prepared the accrual sheets, in sequence of dates. The accrual sheets were totalled and balanced with the records of the bank. The totals were tabulated in sequence of dates, showing totals of accruals from time to time. The accountant then prepared a tabulation of stockholdings, from the stock books and cancelled stock certificates in evidence, the numbers of certificates, number of shares, and their par value. He then computed the liabilities accruing against the various stockholders by checking the period of their stockholdings against the accruals for that period. Deductible assets were taken from the records of the receiver's books, including set-offs and claims paid. After deducting as credits all set-offs shown by the receiver's books, the balance was set forth as the liability.

We cannot agree with the contention that section 6 of article 11 of the constitution should be construed in such a manner as to require plaintiffs, in a representative suit against stockholders of a State bank, to establish not only the liabilities, the time they accrued and the persons who were stockholders, and what number of shares they held, but, in addition, to prove all counter-claims and set-offs against the creditors. The appellants have referred us to no authorities holding that this additional proof is required of appellees. They make a *prima facie* case by proving the same things that would be required in a suit against the bank itself, (*Deland* v. *Dixon Nat. Bank,* 111 Ill. 323,) plus the proof as to the time the stockholders held their stock, and the number and par value of their shares. We have held, without exception, that stockhold-

ers are primarily liable, liable as the bank would be, and that they must pay damages measured by the liabilities that accrued during their stock ownership, limited only by the par value of the shares they held respectively. It would be inconsistent to hold, as we did in *Heine* v. *Degen, supra,* that the defendant stockholders could not require proof to be made of all claims against the bank before the suit against the stockholders proceeded to a decree, and now to hold that plaintiffs, in a representative suit, must not only show the liabilities, but must show, in addition, the cross-demands of the bank against its creditors, and creditors' evidence in rebuttal of such counter-claims and cross-demands. The fact that this is an equity suit does not change the rule that a defendant has the burden of proving defenses he may have to the action. It must be remembered that these defendants had access to the books of the bank and an opportunity to show therefrom that their liabilities should have been further diminished or wiped out entirely by reason of claims the bank had against its creditors. They also had copies of the audit a sufficient length of time in advance of its introduction in evidence. They have failed to point out wherein they or any of them suffered damage by reason of the fact that appellees were not required to make the proof they insist on.

The liability books of the bank were admissible as admissions against interest of the stockholders who held stock when entries contained in the books were made that show liabilities accrued during their particular ownership of the stock. The same is true as to such entries and each succeeding class of stockholders. The testimony shows that, as we have pointed out heretofore, the rule in *Clayton's case* was followed in making up the audit in evidence, and the witnesses who made it determined the time of accrual of liabilities by taking the final balance due a creditor the day the bank closed and determining what last deposits

were made by the creditor, the total of which would equal the balance due him. Here, again, appellants cannot complain of such use of the books of the bank, because they would have had the right to demand that this be done. It was competent against a then-stockholder to show every such deposit as an admission against his interest.

Appellants further contend the accrual audit was erroneous in that it failed to take into consideration the "float." By "float" is meant checks in the process of collection which, when entered in a depositor's account, remain conditional credits until the checks are paid in money or solvent credits. They say unless these conditional credits are taken into consideration the audit is erroneous, that the books of the bank will not show when such checks became unconditional credits, but they fail to point out how any defendant was adversely affected by any such item or that there was any single check or group of checks which was not collected. The answer to this contention is that the debtor-creditor relationship is established when the check is deposited, but that the bank has the right to terminate it and charge the check back against the account if it is not collected. If it is collected the debtor-creditor relation ceases to be conditional and becomes absolute as of the date of the deposit. In *People* v. *Sheridan Trust and Savings Bank,* 358 Ill. 290, 300, this court said: "By the deposit of the check in the general checking account of the candy company the relation of debtor and creditor was created, but by force of the agreement and custom applicable to out-of-town cash items the agreement suspended the relation of debtor and creditor pending the collection of the check. The credit given to the candy company was a conditional credit operative during the time that the Sheridan Bank was undertaking the collection, in due course, of the check." Appellants had the right to show that these conditional credits never became absolute, but this they have not done.

They point to no check that came back unpaid. They thus failed to maintain the burden of showing the relation of debtor and creditor did not become absolute. The bank chose to credit the checks on the dates they were deposited. Even though the pass books and deposit slips contained statements that, until collected, the money the checks called for would not be available to the depositor, or that, until collection was made, the relation of debtor and creditor was suspended, the credits on the ledgers in the various accounts were admissions against interest on the part of the bank and also on the part of the then-stockholders. The appellants had the duty of going forward with the proof and of showing, if such was the case, that this debtor-creditor relation did not come into existence during their respective periods of stock ownership. By the proof furnished by the admissions against interest appellees made a *prima facie* case and it was not their duty to relieve the appellants of the effect of such admissions or to prove a defense they might have proved. This contention cannot be sustained.

Appellants claim it was error to hold David A. Noyes & Company liable on certificate No. 1789 for 20 shares, and certificate No. 1790, for 100 shares of stock. July 2, 1931, certificate No. 1747 was issued to Francis E. Matthews for 170 shares. About October 5, 1931, this certificate was surrendered. An undated power of attorney was attached to it, which authorized David A. Noyes & Company to sell, assign, transfer and set over all or any part of these shares. On the back of this power of attorney was stamped the following: "We hereby certify that we have no ownership in . . . shares of the stock above transferred, the transfer by the owner to us being merely for the purpose of sale. David A. Noyes & Company." Thereafter, three certificates were issued in exchange for No. 1747. One was for 50 shares and was issued to Matthews and is not in question here. The other

two, Nos. 1789 and 1790, were for 20 shares and 100 shares, respectively, and were issued to David A. Noyes & Company. Later these two were endorsed by David A. Noyes & Company and transferred to third parties. The rule is that creditors are entitled to hold him liable as a stockholder who appears on the books of the corporation to be the legal owner of the stock. (*Golden* v. *Cervenka,* 278 Ill. 409; *Sherwood* v. *Illinois Trust and Savings Bank,* 195 id. 112; *Wheelock* v. *Kost,* 77 id. 296.) Appellants contend the rule is inapplicable here for the reason that the power of attorney, the reverse side of which contained the statement disclaiming ownership above quoted, was part of the records of the bank and was notice to the world David A. Noyes & Company was not owner of the stock. This contention cannot be sustained. Stock certificates to a part of the stock described in the power of attorney were later issued to David A. Noyes & Company, received, and, later, endorsed by them. According to the books of the bank David Noyes & Company owned 120 shares of stock. Creditors were not obliged to examine the reverse side of a power of attorney attached to a cancelled stock certificate in order to determine the true *status* of a record stockholder, who, according to his certificate, appears to have the entire title to the stock.

That part of the judgment which holds appellants were liable in excess of $50 per share is reversed, and the cause is remanded to the superior court, with directions to proceed in conformity with the views herein expressed. In all other respects the judgment is affirmed.

*Affirmed in part, reversed in part, and remanded, with directions.*

Mr. JUSTICE SHAW, dissenting.